**OUTTEN & GOLDEN LLP**

Gary Phelan, Esq. (GP0500)
Attorneys for the Plaintiff
4 Landmark Square
Suite 201
Stamford, CT 06901
(203) 363-7888



RECEIVED
OCT 20 2006
U.S.D.C. S.D. N.Y.
CASHIERS

JUDGE COTE

06 CV 10187

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

| | | |
|---|---|---|
| **JEFFREY OH and DEAN DaSUTA** | : | Index No. Civ. |
| | : | |
| **Plaintiffs,** | : | |
| v. | : | **COMPLAINT AND** |
| | : | **JURY DEMAND** |
| **IMAGEMARK, INC.** | : | |
| **BERNARD MARDEN,** | : | |
| **JAMES MARDEN, BRUCE ROSS,** | : | |
| **FRANK BISCONTI and THOM DEAN** | : | |
| | : | |
| **Defendant.** | : | |
| | : | October 19, 2006 |

------------------------------------------------------------x

Plaintiffs, Jeffrey Oh and Dean DaSuta, by their attorneys Outten & Golden LLP, as and

for their Complaint, allege as follows:

<u>NATURE OF THE ACTION</u>

1.      Jeffrey Oh and Dean DaSuta, bring this action against the defendants for

fraudulent misrepresentation and promissory estoppel. Mr. Oh also brings a separate

action for violations of the New York Executive Law, §§269 <u>et seq</u>. ("Executive Law"),

and the Administrative Code and Charter of the City of New York, §§8-107 <u>et seq</u>.

("NYCHRL").

1

## JURISDICTION AND VENUE

2.    This court has jurisdiction under 28 U.S.C. §1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states. The Plaintiffs, Mr. Oh and Mr. DaSuta, are residents of Connecticut, respectively, and Defendants maintained an office in Manhattan and regularly conduct business in New York.

3.    The actions which gave rise to this Complaint occurred within the jurisdiction of this venue.  Venue is proper pursuant to 28 U.S.C. §1391(b).

## PARTIES

4.    The Plaintiff, Jeffrey Oh, is a United States citizen who presently resides at 36 Ledgebrook Drive, Norwalk, CT  06854.  Mr. Oh was an "employee" of Defendant Imagemark, Inc. within the meaning of the New York Executive Law and the New York City Administrative Code.

5.    The Plaintiff, Dean DaSuta, is a United States citizen who presently resides at 14 South River Lane East, Avon, MA  02322.

6.    Defendant, Imagemark, Inc., ("Imagemark") is a corporation which maintained an office located at 430 Park Avenue, Suite 1404, New York, NY 10022 during the period that gave rise to the events in this complaint and is an "employer" as defined by the New York Executive Law and the New York City Administrative Code.  Defendant Imagemark is headquartered at 8700 West Bradley Road, Milwaukee, WI  53224.

7.    Defendant Bernard Marden is the owner of Imagemark and is an "employer" as defined by the New York Executive Law and the New York City Administrative Code.

8.      Defendant James Marden is an officer of Imagemark.

9.      Defendant Bruce Ross is the President of Imagemark.

10.     Defendant Frank Bisconti is the Chief Financial Officer of Imagemark.

11.     Defendant Thom Dean is a President of Imagemark.

### FACTUAL ALLEGATIONS

### Defendants Lured Mr. Oh and Mr. DaSuta away from Highly-Paid Positions by Making False Representations about Imagemark

12.     Mr. Oh is a sales professional with over 12 years of experience in business and management.

13.     In June 2005, Mr. Oh learned that Imagemark was hiring a Senior Vice President of Sales and applied for the position on July 14, 2005.  Imagemark develops strategies for companies to improve their marketing efforts by providing services which range from creating corporate logos to designing or selecting the correct products on which to place the logo.

14.     On July 18, 2005, Defendant Bernard Marden, Imagemark's owner, contacted Mr. Oh to schedule an interview.

15.     On July 19, 2005, Defendant Bernard Marden interviewed Mr. Oh for the Senior Vice President position during dinner at the 21 Club in New York City.

16.     During their dinner meeting in July 2005, Bernard Marden told Mr. Oh that Imagemark was worth $25 million, was projected to reach $50 million in annual sales by the end of 2007 with Mr. Oh's help, and had been extremely profitable.  Bernard Marden

told Mr. Oh that he was "exactly what Imagemark was looking for." Bernard Marden also discussed opportunities for Mr. Oh to own equity in Imagemark.

17.    At the time, Mr. Oh was a consultant for Liquidation.com and earned $120,000 per year plus a bonus and equity. He was in the process of considering other offers of employment with starting annual salaries of $120,000 plus a guaranteed bonus and equity. Mr. Oh made Mr. Marden aware of his other employment offers.

18.    Before working for Liquidation.com, Mr. Oh worked with Mr. DaSuta at Aramark Services. Mr. Oh told Mr. DaSuta that Imagemark was in the process of hiring candidates to fill various positions. Mr. DaSuta visited Imagemark's website and applied for the Regional Vice President of Sales position.

19.    At the time when Mr. DaSuta applied for the regional Vice President of Sales position with Imagemark, he was Aramark Services' Director of Sales and earned $110,00 per year.

20.    In late July 2005, Mr. Oh and Mr. DaSuta met with Bruce Ross and Thom Dean in Imagemark's New York office. Mr. Ross and Mr. Dean reiterated that Imagemark was a $25 million dollar company that could become a $50 million company with Mr. Oh and Mr. DaSuta's help. Mr. Ross and Mr. Dean stated that Imagemark was a highly profitable company with numerous high caliber and lucrative accounts.

21.    Bernard Marden verbally offered Mr. Oh the Senior Vice President position, with a base salary of $135,000, a $30,000 guaranteed annual bonus and an opportunity to own equity in Imagemark.

22.    Upon information and belief, Bernard Marden knew that Mr. Oh would be leaving a highly-paid position and declining other employment opportunities if he accepted Imagemark's offer.

23.    Bernard Marden verbally offered Mr. DaSuta a base salary of $110,000, a $20,000 guaranteed annual bonus, and an opportunity to own equity in Imagemark.

24.    Upon information and belief, Defendant Bernard Marden knew that Mr. DaSuta would be leaving a highly-paid position with Aramark Serives if he accepted Imagemark's employment offer.

25.    In August 2005, Imagemark presented Mr. Oh and DaSuta with offer letters.

26.    Mr. Oh and Mr. DaSuta decided to join Imagemark because of Mr. Marden's representation about the financial worth and profitability of Imagemark, and his suggestion that there was an immediate opportunity to own equity.

27.    In August 2005, Mr. Oh signed an offer letter accepting Defendants' offer to become the Senior Vice President of Sales at a base salary of $135,000, a $30,000 guaranteed bonus, and Defendant Bernard Marden's promise of the opportunity to own equity in Imagemark.

28.    In August 2005, Mr. DaSuta signed an offer letter accepting Defendants' offer to become the Regional Vice President of Sales at a base salary of $110,000, a $20,000 guaranteed bonus, and Defendant Bernard Marden's promise of the opportunity to own equity in Imagemark.

29.    After accepting Imagemark's offer of employment, Mr. Oh resigned from Liquidation.com and declined other employment opportunities based on Bernard Marden's representations about Imagemark's financial worth, the company's profit

potential and his representation that there was an immediate opportunity to own equity in the company.

30.    After accepting Imagemark's offer of employment, Mr. DaSuta resigned from Aramark and declined other employment opportunities based on Bernard Marden's representations about Imagemark's financial worth, the company's profit potential and his representation that there was an immediate opportunity to own equity in the company.

31.    While discussing the terms of Imagemark's employment offer letter, Frank Bisconti informed Mr. Oh and Mr. DaSuta that Imagemark was only worth $17 million.

32.    Mr. Oh and Mr. DaSuta asked Defendants Bernard Marden, Bruce Ross, Thom Dean and Frank Bisconti about the discrepancy between Bernard Marden's initial representation that Imagemark was worth $25 million, was currently highly profitable and would reach a projected $50 million in annual sales by 2007 with the leadership of Mr. Oh and Mr. DaSuta, and Mr. Bisconti's subsequent representation that Imagemark was worth only $17 million.

33.    Bernard Marden, Bruce Ross, Thom Dean and Frank Bisconti assured Mr. Oh and Mr. DaSuta that Imagemark was currently worth $25 million, was highly profitable and would reach a projected $50 million in annual sales by the end of 2007.

34.    Mr. Oh and Mr. DaSuta signed the employment offer letters in August 2005.

35.    Mr. Oh and Mr. DaSuta started working for Imagemark on August 8, 2005.

## Imagemark's Financially Instability

36.    During Mr. Oh and Mr. DaSuta's first week of work, they learned that for approximately 80% of Imagemark's accounts, Imagemark purchased materials and

custom designed products for customers without a contract or any documentation

establishing the payment terms, liability or pricing. Imagemark was financially

vulnerable because without binding agreements, Imagemark's customers could refuse to

pay for its products and services.

37.     Within their first month at Imagemark, Mr. Oh and Mr. DaSuta also learned that

Imagemark had lost vendors and had strained relationships with existing vendors due to

making late payments, or any payments, to vendors.

38.     Within their first month at Imagemark, Mr. Oh and Mr. DaSuta learned that

Imagemark was severely underfinanced. For example, its operating budget could not

cover staff salaries. Mr. Oh and Mr. DaSuta had to ask Bernard Marden and his son,

James Marden, to discuss additional financing for the company.

39.     On August 28, 2005, Mr. Oh and Mr. DaSuta met with Bernard Marden and

James Marden to discuss Imagemark's financial instability.

40.     During the August 28th meeting, Bernard Marden and James Marden gave Mr.

Oh and Mr. DaSuta the Business Reorganization and Financial Turn-Around Plan

("Turn-Around Plan"), which financially analyzed Imagemark from 1998 to July 2004.

41.     After reviewing the Turn-Around Plan, Mr. Oh and Mr. DaSuta learned that in

Imagemark's history, it never had a profitable year and was financially stressed.

42.     According to the Turn-Around Plan, Imagemark had lost $9 million over the

previous three years.

43.     Contrary to Defendants' representations, upon information and belief,

Defendants possessed and had access to the Turn-Around Plan and knew that Imagemark

was not worth $25 million, or even $17 million, at the time they made job offers to Mr. Oh and Mr. DaSuta.

### Defendants Promised Mr. Oh and Mr. DaSuta Equity in Imagemark

44.      To rebuild Imagemark, Mr. Oh and Mr. DaSuta proposed a business strategy called the "Profit Plan," which was designed to improve Imagemark's business in one year. Bernard Marden, James Marden, Mr. Ross, Mr. Dean and Mr. Bisconti all agreed with the strategies in the Profit Plan and implemented it in September 2005.

45.      Defendants Bernard Marden, James Marden, Bruce Ross, Thom Dean, and Frank Bisconti told Mr. Oh and Mr. DaSuta that their performance was excellent. Bernard Marden, James Marden and Bruce Ross and Thom Dean told Mr. Oh and Mr. DaSuta that, "we have been looking for two guys like you who can help run the business."

46.      In September 2005, over discussions about future financing to stabilize Imagemark, Defendant Bernard Marden promised equity in Imagemark to Mr. Oh and Mr. DaSuta. After making the oral promise, Bernard Marden made almost daily comments about equity to Mr. Oh and Mr. DaSuta, such as asking each of them what percentage of equity they wanted. Each time Bernard Marden discussed equity with Mr. Oh and Mr. DaSuta, he gradually increased their percentage of equity. Bernard Marden expressed that, eventually, he wanted Mr. Oh and Mr. DaSuta to manage Imagemark's daily operations instead of Mr. Ross.

## Defendants Breached Their Promises to Give Mr. Oh and Mr. DaSuta Equity

47.    In September 2005, Mr. Oh and Mr. DaSuta met with Bernard Marden for dinner at the Metropolitan Club in New York City.  During dinner, Mr. Marden said that he hated "Japs."  Mr. Oh told Defendant Bernard Marden that his father was Korean.  Before Mr. Oh's disclosure, Defendant Bernard Marden did not know that Mr. Oh was Korean-American.  Defendants employ approximately 80 people, and none of them are of Asian descent; all six of Respondents senior-level managers are Caucasian.

48.    Mr. Marden often referred to owning equity in Imagemark as being "part of the family."  In October 2005, Mr. Oh asked Bernard Marden how he could become part of the family.  Mr. Marden told Mr. Oh that if he wanted to join the Imagemark family and advance within the company as an equity owner, Mr. Oh should "separate from his wife."  Mr. Oh's wife was African-American.  (Bernard Marden was unaware of Mr. Oh's wife's race before he was hired and learned this information during random conversations in the office in September 2005.)  Mr. Oh went home that evening and told his wife, Traci Oh, about Mr. Marden's statement.

49.    Mr. Oh refused to leave his wife.

50.    In November 2005, Bernard Marden told Mr. Oh and Mr. DaSuta that if they wanted to become leaders in the company they had to relocate to Milwaukee, Wisconsin where Imagemark's corporate headquarters are located.

51.    In November 2005, Bernard Marden, James Marden, Mr. Oh and Mr. DaSuta met for breakfast. During breakfast, James Marden credited Mr. Oh and Mr. DaSuta with making more improvements to Imagemark in four months than anyone else had in seven years and expressed that their percentage of equity should be greater than Mr. Ross'.

52.    In November 2005, Defendants hired Marc Richman as the Vice President of Business Development.

53.    From September 2005 to November 2005, Bernard Marden, Mr. Oh and Mr. DaSuta negotiated the terms of Mr. Oh and Mr. DaSuta's equity percentage in Imagemark.  On November 14, 2005, Bernard Marden faxed an equity template agreement to Mr. Oh and Mr. DaSuta, which was unsigned, undated, and did not include either Mr. Oh or Mr. DaSuta's names or their equity percentage.

54.    On November 30, 2005, Mr. Oh and Mr. DaSuta faxed their concerns about the equity agreement to Bernard Marden.

55.    On December 2, 2005, Mr. Oh, Mr. DaSuta, Bernard Marden and Mr. Richman had a telephone conversation during which Bernard Marden said that the equity agreement was finalized and was to take effect on January 1, 2006.

56.    On December 4, 2005, Defendant Bernard Marden called Mr. Oh and Mr. DaSuta to tell them that their employment was terminated.  He did not give an explanation for the termination.

57.    Mr. Richman became Imagemark's Chief Operating Officer and took over Mr. Oh and Mr. DaSuta's duties after they were terminated.

58.    At no time during Mr. Oh or Mr. DaSuta's employment did Defendant's express or indicate to Mr. Oh or Mr. DaSuta that there were any perceived performance issues.

## LEGAL CLAIMS

## FIRST COUNT: FRAUDULENT MISREPRESENTATION

## IMAGEMARK FRAUDULENTLY MISREPRESENTED FACTS WHICH WRONGFULLY INUDCED MR. OH AND MR. DaSUTA TO ENTER INTO EMPLOYMENT WITH DEFENDANTS

59.     Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

60.     Bernard Marden initially told Mr. Oh and Mr. DaSuta that Imagemark, was worth at least $25 million, when it was actually worth $10 million, and also offered equity in Imagemark.

61.     Upon information and belief, Bernard Marden knew, from the 2004 Turn-Around Plan, that Imagemark was not worth $25 million, was financially unstable, and had not been profitable.

62.     Upon information and belief, Bernard Marden relayed false information about Imagemark's net worth and performance to Mr. Oh and Mr. DaSuta to fraudulently induce them to join and continue to work for Imagemark.

63.     Mr. Oh and Mr. DaSuta resigned from their positions with Liquidation.com and Aramark, respectively, in reasonable reliance on Bernard Marden's representation of existing facts about Imagemark's value, profitability, and financial stability.

64.     Mr. Oh and Mr. DaSuta would not have resigned from their former positions with Liquidation.com and Aramark, respectively, if Bernard Marden had told them that Imagemark had lost $9 million in the last three years, was only worth $10 million, had never been profitable in its history of operations, and was financially unstable.

65.     Mr. Oh and Mr. DaSuta have suffered damages as a result of Defendant Imagemark's unlawful acts, including the loss of benefits and salary connected with their

former employers, past and future lost wages and benefits and past and future severe

emotional trauma.

### SECOND COUNT: FRAUDULENT MISREPRESENTATION

#### BERNARD MARDEN FRAUDULENTLY MISREPRESENTED FACTS WHICH WRONFULLY INDUCED MR. OH AND MR. DaSUTA TO ENTER INTO EMPLOYMENT WITH DEFENDANTS

66.    Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

67.    Bernard Marden initially told Mr. Oh and Mr. DaSuta that Imagemark, was

worth at least $25 million, when it was actually worth $10 million, and also offered

equity in Imagemark.

68.    Upon information and belief, Bernard Marden knew, from the 2004 Turn-Around

Plan, that Imagemark was not worth $25 million, was financially unstable, and had not

been profitable.

69.    Upon information and belief, Bernard Marden relayed false information about

Imagemark's net worth and performance to Mr. Oh and Mr. DaSuta to fraudulently

induce them to join and continue to work for Imagemark.

70.    Mr. Oh and Mr. DaSuta resigned from their positions with Liquidation.com and

Aramark, respectively, in reasonable reliance on Bernard Marden's representation of

existing facts about Imagemark's value, profitability, and financial stability.

71.    Mr. Oh and Mr. DaSuta would not have resigned from their former positions

with Liquidation.com and Aramark, respectively, if Bernard Marden had told them that

Imagemark had lost $9 million in the last three years, was only worth $10 million, had

never been profitable in its history of operations, and was financially unstable.

72.     Mr. Oh and Mr. DaSuta have suffered damages as a result of Defendant

Bernard Marden's unlawful acts, including the loss of benefits and salary connected with

their former employers, past and future lost wages and benefits and past and future severe

emotional trauma.


### THIRD COUNT: FRAUDULENT MISREPRESENTATION
### FRANK BISCONTI FRAUDULENTLY MISREPRESENTED FACTS WHICH
### WRONFULLY INDUCED MR. OH AND MR. DaSUTA TO CONTINUE THEIR
### EMPLOYMENT WITH DEFENDANTS

73.     Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

74.     According to the 2004 Turn-Around Plan, Imagemark had not been profitable in

its history of operations.

75.     Frank Bisconti told Mr. Oh and Mr. DaSuta that Imagemark was a highly

profitable business projected to make $50 million in annual sales with Mr. Oh and Mr.

DaSuta.

76.     Defendant Frank Bisconti made clear and unambiguous representations about

Imagemark's financial stability to Mr. Oh and Mr. Dean.

77.     Relying on Frank Bisconti's promise, Mr. Oh and Mr. DaSuta did not seek other

employment opportunities, and continued to work for Imagemark despite learning that

the company was worth $15 million less than they were originally told.

78.     Mr. Oh and Mr. DaSuta have suffered damages as a result of Mr. Bisconti's

unlawful acts, including past and future lost wages and benefits, past and future severe

emotional trauma, and the costs of bringing this action, including attorneys' fees.

## FOURTH COUNT:  PROMISSORY ESTOPPEL

79.    Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

80.    In July 2005 Defendant Bernard Marden told Mr. Oh and Mr. DaSuta that Imagemark was worth $25 million and was highly profitable.

81.    In July 2005, Defendant Bernard Marden told Mr. Oh and Mr. DaSuta that Imagemark was projected to make $50 million in annual sales with Mr. Oh and Mr. DaSuta.

82.    According to the 2004 Turn-Around Plan, Imagemark had not been profitable in the history of its operations.

83.    Once Mr. Oh and Mr. DaSuta learned that Imagemark was not financially stable and was worth $10 million instead of $25 million, Defendant Bernard Marden made a clear and unambiguous promise to give each of them substantial equity in Imagemark.

84.    In reliance on Defendant Bernard Marden's clear promise of equity in Imagemark, Mr. Oh and Mr. DaSuta did not seek other employment opportunities, and continued to work for Imagemark despite learning that the company was worth $15 million less than they were originally told.

85.    Mr. Oh and Mr. DaSuta gave up other employment opportunities to continue working with Imagemark because of Bernard Marden's promise.

86.    Defendant Bernard Marden breached his promise to give Mr. Oh and Mr. DaSuta equity when he terminated their employment with Imagemark on December 4, 2005.

87.    Mr. Oh and Mr. DaSuta have suffered damages as a result of Defendant Imagemark's unlawful acts, including past and future lost wages and benefits and past and future severe emotional trauma.

## FIFTH COUNT:  PROMISSORY ESTOPPEL

88.     Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

89.     According to the 2004 Turn-Around Plan, Imagemark had not been profitable in its history of operations.

90.     However, in July 2005 Defendant Bernard Marden told Mr. Oh and Mr. DaSuta that Imagemark was a highly profitable business projected to make $50 million in annual sales with Mr. Oh and Mr. DaSuta.

91.     Once Mr. Oh and Mr. DaSuta learned that Imagemark was not financially stable and was worth $10 million instead of $25 million, Defendant Bernard Marden offered to give each of them substantial equity in Imagemark.

92.     In reliance on Defendant Bernard Marden's clear promise of equity in Imagemark, Mr. Oh and Mr. DaSuta did not seek other employment opportunities, and continued to work for Imagemark despite learning that the company was worth $15 million less than they were originally told.

93.     Mr. Oh and Mr. DaSuta gave up other employment opportunities to continue working with Imagemark because of Bernard Marden's promise.

94.     Defendant Bernard Marden breached his promise to give Mr. Oh and Mr. DaSuta equity when he terminated Mr. Oh and Mr. DaSuta's employment with Imagemark on December 4, 2005.

95.     Mr. Oh and Mr. DaSuta have suffered damages as a result of Defendant Bernard Marden's unlawful acts, including past and future lost wages and benefits and past and future severe emotional trauma.

## SIXTH COUNT:  PROMISSORY ESTOPPEL

96.     Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

97.     According to the 2004 Turn-Around Plan, Imagemark had not been profitable in its history of operations.

98.     However, James Marden told Mr. Oh and Mr. DaSuta that Imagemark was a highly profitable business projected to make $50 million in annual sales with Mr. Oh and Mr. DaSuta.

99.     Once Mr. Oh and Mr. DaSuta learned that Imagemark was not financially stable and was worth $10 million instead of $25 million, James Marden offered to give each of them substantial equity in Imagemark.

100.     In reliance on James Marden's promises of equity, ownership, and a long-term career managing Imagemark, Mr. Oh and Mr. DaSuta did not seek other employment opportunities, and continued to work for Imagemark despite learning that the company was worth $15 million less than they were originally told.

101.     Defendant James Marden made clear and unambiguous promises to Mr. Oh and Mr. Dean about both Imagemark's financial stability and an equity offer in Imagemark.

102.     Defendant James Marden breached his promise to give Mr. Oh and Mr. DaSuta equity in the company by terminating Mr. Oh and Mr. DaSuta's employment with Imagemark on December 4, 2005.

103.     Mr. Oh and Mr. DaSuta have suffered damages as a result of James Marden's unlawful acts, including past and future lost wages and benefits and past and future severe emotional trauma.

## SEVENTH COUNT:  PROMISSORY ESTOPPEL

104.    Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

105.    According to the 2004 Turn-Around Plan, Imagemark had not been profitable in its history of operations.

106.    Bruce Ross told Mr. Oh and Mr. DaSuta that Imagemark was a highly profitable business projected to make $50 million in annual sales with Mr. Oh and Mr. DaSuta on board.

107.    Once Mr. Oh and Mr. DaSuta learned that Imagemark was not financially stable and was worth $10 million instead of $25 million, Defendant Bruce Ross promised to give each of them equity in Imagemark.

108.    Defendant Bruce Ross made clear and unambiguous representations to each plaintiff about Imagemark's financial stability as well as offering each of them equity in the company.

109.    In reliance on Bruce Ross' promise of equity in Imagemark, Mr. Oh and Mr. DaSuta did not seek other employment opportunities, and continued to work for Imagemark despite learning that the company was worth $15 million less than they were originally told.

110.    Bruce Ross breached his offer of equity by terminating Mr. Oh and Mr. DaSuta's employment with Imagemark.

111.    Mr. Oh and Mr. DaSuta have suffered damages as a result of Mr. Ross' unlawful acts, including past and future lost wages and benefits and past and future severe emotional trauma.

## EIGHTH COUNT: PROMISSORY ESTOPPEL

112.    Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

113.    According to the 2004 Turn-Around Plan, Imagemark had not been profitable in its history of operations.

114.    Thom Dean told Mr. Oh and Mr. DaSuta that Imagemark was a highly profitable business projected to make $50 million in annual sales with Mr. Oh and Mr. DaSuta on board.

115.    In reliance on Thom Dean's promise, Mr. Oh and Mr. DaSuta did not seek other employment opportunities, and continued to work for Imagemark despite learning that the company was worth $15 million less than they were originally told.

116.    Defendant Thom Dean made clear and unambiguous promises to each plaintiff about the company's financial stability.

117.    Mr. Oh and Mr. DaSuta have suffered damages as a result of Mr. Dean's unlawful acts, including past and future lost wages and benefits and past and future severe emotional trauma

## NINTH COUNT

## DEFENDANTS TERMINATED MR. OH's EMPLOYMENT BECAUSE OF HIS RACE IN VIOLATION OF THE NEW YORK EXECUTIVE LAW, §§296 et seq.

118.    Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

119.    Defendant Bernard Marden offered Mr. Oh equity and leadership opportunities in Imagemark if he accepted Imagemark's job offer.

18

120.    Mr. Oh accepted Imagemark's job offer.

121.    In September 2005, Defendant Bernard Marden told Mr. Oh that he hated "Japs."

122.    In September 2005, Mr. Oh informed Defendant Bernard Marden that he was Korean-American.

123.    Defendants, at the time, did not have any employees of Asian descent.

124.    In December 2005, Defendants terminated Mr. Oh three months after learning that he was Korean-American.

125.    Mr. Oh performed his job well throughout the approximately four months he worked for the defendant.

126.    By its actions, Defendants violated NYSHRL, § 296(1)(a) when they discriminatorily terminated Mr. Oh's employment because of his race.

127.    Mr. Oh has suffered damages as a result of Defendants' unlawful acts, including past and future lost wages and benefits and past and future severe emotional trauma.

## TENTH COUNT

### VIOLATION OF THE NEW YORK EXECUTIVE LAW, §§296 et seq. DEFENDANTS IMAGEMARK AND BERNARD MARDEN TERMINATED MR. OH's EMPLOYMENT BECAUSE HE IS MARRIED TO AN AFRICAN-AMERICAN WOMAN

128.    Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

129.    Defendant Bernard Marden offered Mr. Oh leadership and equity opportunities in Imagemark if he accepted Imagemark's job offer.

130.    Mr. Oh accepted Imagemark's job offer.

131.    In October 2005, Defendant Bernard Marden told Mr. Oh that he should separate from his wife if he wanted to become an equity owner and part of the Imagemark family.

132.    Bernard Marden knew that Mr. Oh's wife is African-American.

133.    Bernard Marden called Mr. Oh's home in November 2005, telling to Mr. Oh's wife, Traci Oh, that she leave Mr. Oh and that he had the name of a good attorney.

134.    Mr. Oh refused to separate from his wife.

135.    In December 2005, Defendants terminated Mr. Oh when he refused to leave his wife.

136.    By its actions, Defendants violated NYSHRL, § 296(1)(e) when they discriminatorily terminated Mr. Oh's employment because he was married to an African-American woman.

137.    Mr. Oh has suffered damages as a result of Defendants' unlawful acts, including past and future lost wages and benefits and past and future severe emotional trauma.

## ELEVENTH COUNT

### VIOLATION OF NYCHRL, §8-107.1
### DEFENDANTS IMAGEMARK AND BERNARD MARDEN TERMINATED MR. OH's EMPLOYMENT BECAUSE OF HIS RACE

138.    Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

139.    Defendant Bernard Marden offered Mr. Oh equity and leadership opportunities in Imagemark if he accepted Imagemark's job offer.

140.    Mr. Oh accepted Imagemark's job offer.

141.    In October 2005, Defendant Bernard Marden told Mr. Oh and Mr. DaSuta that he hated "Japs."

142.    In response, Mr. Oh told Bernard Marden that he was Korean-American.

143.    Defendants, at the time, did not have any employees of Asian descent.

144.    On December 4, 2005, Imagemark and Bernard Marden terminated Mr. Oh after learning that he was Korean-American.

145.    By its actions, defendants violated the NYCHRL, § 8-107.1 when it discriminatorily terminated Mr. Oh's employment because of his race.

146.    Mr. Oh has suffered damages as a result of defendants' unlawful acts, including past and future lost wages and benefits and past and future severe emotional trauma.

### TWELFTH COUNT

### VIOLATION OF THE NYCHRL, § 8-107.7
### DEFENDANTS IMAGEMARK AND BERNARD MARDEN TERMINATED MR. OH's EMPLOYMENT BECAUSE HIS WIFE IS AFRICAN-AMERICAN

147.    Paragraphs 1-58 are incorporated by reference the same as if fully pled herein.

148.    Defendant Bernard Marden offered Mr. Oh equity and leadership opportunities in Imagemark if he accepted Imagemark's job offer.

149.    Mr. Oh accepted Imagemark's job offer.

150.    In October 2005, Defendant Bernard Marden told Mr. Oh that he should separate from his wife if he wanted to become an equity owner and part of the Imagemark family.

151.    Bernard Marden knew that Mr. Oh's wife was African-American.

152.    Mr. Oh refused to separate from his wife.

153.    In November 2005, Defendant Bernard Marden made attempts to have Mr. Oh separate from his wife.  Mr. Marden told Mr. Oh's wife that she should leave Mr. Oh and that he had the name of a good attorney.

154.    In December 2005, Defendants terminated Mr. Oh two months after he refused to separate from his wife.

155.    By its actions, Defendants violated NYCHRL, § 8-107.7 when they discriminatorily terminated Mr. Oh's employment because he is married to an African-American woman.

156.    Mr. Oh has suffered damages as a result of Defendants' unlawful acts, including past and future lost wages and benefits and past and future severe emotional trauma.


**<u>PRAYER FOR RELIEF</u>**


**WHEREFORE**, Plaintiff respectfully requests that this Court:


A.    Accept jurisdiction over this action;

B.    Order the Defendants to compensate the Plaintiffs for their past and future loss of wages and benefits, plus interest;

C.    Enter judgment in favor of the Plaintiffs for such amount as may be awarded by a jury for compensatory damages for their physical and emotional suffering and loss of enjoyment of life;

D.    Enter judgment in favor of the Plaintiffs for such amount as may be awarded by a jury for punitive damages;

E.    Reinstate the Plaintiffs to their former positions or, in lieu of reinstatement, award them front pay (including benefits);

F.    Award to the Plaintiffs all costs and reasonable attorneys' fees incurred in

connection with this action;

G.    Grant such additional or alternative relief as may appear to the court to be just and

equitable.


**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims properly triable by a jury.


Dated:    Stamford, CT
          October 19, 2006


                              Respectfully submitted,

                              OUTTEN & GOLDEN LLP

                              By
                              Gary Phelan, Esq. (GP 0500)
                              Attorneys for the Plaintiff
                              Outten and Golden LLP
                              4 Landmark Square
                              Suite 201
                              Stamford, CT  06901
                              (203) 363-7888